UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DAWN INGIANNI,

                Plaintiff,

    - against -

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
----------------------------------------------------------------x

**MEMORANDUM AND ORDER**
19-CV-3008 (RRM)

ROSLYNN R.  MAUSKOPF, Chief United States District Judge.

        Dawn Ingianni brings this action against the Commissioner of the Social Security

Administration ("the Commissioner") pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking

review of the Commissioner's determination that she was not disabled and, therefore, not eligible

for Supplemental Security Income ("SSI") beginning on February 28, 2017.  Ingianni and the

Commissioner now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  (Pl.'s Mot. (Doc. No. 18); Def.'s Mot. (Doc. No. 20).)  For the

reasons set forth below, the Commissioner's motion is denied, and Ingianni's motion is granted

to the extent that it requests that this matter be remanded to the Commissioner for further

proceedings.

# BACKGROUND

        Ingianni was born in 1965.  ((Certified Administrative Record ("Tr.") (Doc. No. 22) at

100.)[1]  She completed a master's degree in Nursing.  (Tr. at 74.)  She worked as director of

clinical services at a women's medical center from September 2016 to February 2017.  (Tr. at 86,

207–08.)

---

[1] Cites to the Certified Administrative Record use the original pagination.

### I.      Medical Evidence Prior to Alleged Disability Onset Date

On February 23, 2000, Ingianni was struck by a car and suffered a left bimalleolar

fracture and dislocation of the ankle.  (Tr at 256.)  She underwent a surgical procedure, open

reduction with internal fixation of left ankle, which involved the installation of a metal plate and

several screws in order to stabilize the ankle.  (Tr. at 256–57.)

On October 18, 2012, Ingianni underwent a lumbar spine MRI.  (Tr. at 277–78.)  The

MRI showed a disc bulge at L4-L5, resulting in bilateral neural foramen stenosis with posterior

facet arthropathy, and disc bulges at L2-L3, L3-L4, and L5-S1 without stenosis.  (Tr. at 277.)

Dr. Steven Sheskier

On October 26, 2015, Dr. Sheskier performed further surgery on Ingianni, performing a

left foot great toe first metatarsophalangeal ("MTP") joint fusion, second and third

metatarsocuneiform fusion, and exostectomy.  (Tr. at 269.)

On April 1, 2016, an ultrasound revealed mild synovitis, or inflammation of connective

tissue, at the fourth and fifth tarsometatarsal ("TMT") joints.  (Tr. at 327.)  A computed

tomography ("CT") scan of the same date revealed joint space narrowing and articular

irregularity of the second and third TMT joints, meaning that the cartilage between the bones in

the TMT joints had been damaged, leading the bones to rub against each other.  (Tr. at 329.)  The

CT scan also revealed a screw protruding into the first intercuneiform space, and punctate

calcification at the second metatarsal insertion of the Lisfranc ligament.  (Tr. at 329.)  Ingianni

received a therapeutic injection of a mixture containing 0.5 cc 1% lidocaine, 0.5 cc 0.5%

ropivacaine, and 1 cc Depo-Medrol (40 mg/mL).  (Tr. at 327.)

On April 15, 2016, Ingianni again saw Dr. Sheskier for severe foot pain.  (Tr. at 312.)  He tried to "un-weight it with a dancer's pad" but there was minimal relief.  (*Id*.)  He prescribed a bone stimulator, continued use of a short-leg walking brace, and possible surgery. (*Id*.)

On May 2, 2016, Dr. Sheskier surgically removed the metal plate from Ingianni's ankle and performed a re-fusion of the second and third metatarsocuneiform joints.  (Tr. at 272.)

At her September 6, 2016, follow-up appointment, Ingianni reported no pain in the second and third metatarsocuneiform joints, but she did have eight of ten pain in the fourth and fifth joints and the second webspace.  (Tr. at 308–09.)  Plain x-rays showed continued consolidation of the fusions of the second and third metatarsocuneiform joints.  (Tr. at 309.)  Dr. Sheskier recommended that Ingianni use a stiff-soled orthotic and metatarsal pads.  (*Id*.)

## II.    Medical Evidence on and after Ingianni's Alleged Disability Onset Date

<u>Dr. Steven Sheskier</u>

On May 4, 2017, Dr. Sheskier surgically removed a metal screw from Ingianni's left foot, removed debridement from the head of the screw and across the third metatarsocuneiform joint, and sent the fibrous tissue to Pathology.  (Tr. at 291.)  Ingianni reported no musculoskeletal issues, and her physical examination did not reveal any.  (Tr. at 288, 290.)  Ingianni was discharged the same day "in stable condition," in "[n]o pain or distress," and ambulating with crutches.  (Tr. at 290.)

Ingianni saw Dr. Sheskier for a post-operative visit on May 17, 2017, at which she used crutches and wore a walking boot.  (Tr. at 302.)  Dr. Sheskier noted x-rays showing degenerative changes in the left foot, irregularity, and an area of likely avascular necrosis, which is a condition where the blood supply is cut off to the bone, resulting in bone death.  (*Id*.)  He opined that

Ingianni was 100% disabled with a guarded prognosis.  (*Id*.)  He limited her to lifting five

pounds and walking fifteen feet.  (*Id*.)

On September 19, 2017, a left lower extremity CT revealed complete fusion the first

TMT joint, arthrodesis – or, immobilization of the joint – without evidence of osseous fusion of

the second TMT joint, and an unfused third TMT joint.  (Tr. at 406.)  On October 18, 2017, Dr.

Sheskier prescribed Ingianni a bone stimulator.  (Tr. at 407.)

Dr. Sheskier completed a medical source statement dated November 3, 2017.  (Tr. at

410–11.)  He cited diagnoses of i) left lower extremity hallux rigidus (fused) and ii)

Degenerative Joint Disease of the midfoot with nonunion, which is the failure of fractured bones

to heal.  (Tr. at 410.)  Dr. Sheskier opined that Ingianni was limited to lifting/carrying five

pounds occasionally.  (*Id*.)  He opined that Ingianni could maintain sitting for one hour in a

workday setting "due to swelling of foot and pain."  (*Id*.)  He also opined she was not to stand or

walk in a workday.  (*Id*.)  Dr. Sheskier further opined limitation to occasional bending and, due

to lower extremity issues, frequent reaching and handling and no pushing/pulling.  (Tr. at 411.)

On June 21, 2017, Ingianni saw orthopedist Heidi Stephens, M.D., reporting continuing

pain in the left foot.  (Tr. at 385.)  Dr. Stephens reviewed a bone scan with Ingianni showing a

solid metatarsophalangeal joint, but that the Lisfranc area "where the fusions were attempted"

was "quite hot," probably due to "a delayed or nonunion."  (*Id*.)  Dr. Stephens recommended a

bone stimulator.  (*Id*.)  She also recommended an orthotic evaluation because she found that the

MTP joint fused in an elevated manner, shifting Ingianni's weight bearing.  (*Id*.)  She prescribed

Tylenol III (with codeine) and referred Ingianni for pain management, as she determined in

discussion with Dr. Sheskier that surgical intervention was not indicated for the near future.  (*Id*.)

4

<u>Dr. Iqbal Teli, M.D., Consultative Examiner</u>

On July 31, 2017, Iqbal Teli, M.D., conducted a consultative examination. (Tr. at 395–97.) Ingianni reported continuous pain over the left foot at an intensity of eight of ten. (Tr. at 395.) She also experienced numbness in the foot. (*Id*.) She had been advised to use crutches for weight bearing purposes and declined to walk without them, though she needed no help changing for the examination or getting and off the examination table, and was able to rise from a chair without difficulty. (Tr. at 395–96.) Ingianni reported that she was able to shower but needed "help with dressing." (Tr. at 395.) Upon examination, she had full range of motion in the hips, knees, and ankles. (T 396.) Straight leg raise testing was negative, and she exhibited full ranges of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles. (*Id*.) Her joints were stable and non-tender. (*Id*.) She had full strength in her arms and legs. (*Id*.) Touch sensation was decreased in the left leg. (Tr. at 396.) There was tenderness to the dorsum of the left foot, the left ankle, and the left foot was colder than the right. (*Id*.) Dr. Teli opined that Ingianni had "moderate restrictions for prolonged standing, walking, climbing, and bending." (*Id*.)

<u>Dr. Nadine Gardner, Psy. D., Consultative Examiner</u>

On July 31, 2017, Nadine Gardner, Psy.D. conducted a psychological consultative examination. (Tr. at 388–92.) Ingianni stated that she had seen a psychiatrist between 2005 and 2007 and had no history of psychiatric hospitalizations. (Tr. at 388.) Ingianni reported that she took Valium 5mg as needed, which was prescribed by Nurse Practitioner Setterbon. (*Id*.) Ingianni reported difficulty falling asleep, waking about five times a night, dysphoric mood, crying spells, loss of interest, irritability, fatigue, social withdrawal, and diminished self-esteem. (Tr. at 388–89.) She reported that she had panic attacks three or four times a month, and

memory and concentration difficulties.  (Tr. at 389.)  Her spouse did the cooking, cleaning,

laundry, and shopping.  (Tr. at 390.)  She had friends but had no recent contact with them; she

described her family relationships as "okay."  (Tr. at 390.)  On exam, Ingianni's mood was

mildly dysthymic with a mildly anxious affect.  (Tr. at 389.)  She was unable to complete serial

sevens and became upset, but she did complete serial threes.  (Tr. at 390.)  She was fully

oriented, her intellectual functioning was above average, and her insight and judgment were

good.  (*Id*.)  Dr. Gardner diagnosed i) adjustment disorder with mixed anxiety and depression

and ii) panic attacks.  (Tr. at 391.)  She opined that Plaintiff had no impairments in her abilities

to understand, remember, and apply simple or complex directions and instructions; to use reason

or judgment to make work-related decisions; or to interact appropriately with others.  (*Id*.)  She

opined that Ingianni had mild limitation in i) sustaining concentration and performing a task at a

consistent pace, ii) sustaining an ordinary routine, and iii) regulating emotions.  (*Id*.)  Dr.

Gardner opined that Ingianni's limitations would not in and of themselves interfere with her

ability to function on a daily basis.  (*Id*.)

Dr. Dinar Sajan, M.D.

On October 31, 2017, Ingianni began seeing Dinar Sajan, M.D., for psychiatric treatment

with diagnoses of recurrent severe major depressive disorder, anxiety disorder, and panic

disorder.  (Tr. at 412.)  Dr. Sajan reported that Ingianni was prescribed Celexa 20 mg.  (*Id*.)

Dr. Ginige DeSilva, M.D.

On January 15, 2018, Ingianni saw rheumatologist Ginige DeSilva, M.D., for left foot

pain.  (Tr. at 414.)  She diagnosed localized osteoporosis with current pathological fracture with

delayed healing, psoriasis, arthritis with psoriasis, and long-term medication use.  (*Id*.)  Ingianni

was taking Citalopram, Diazepam, and Tylenol III.  (*Id*.)  Dr. DeSilva added Forteo, an

injectable medication that stimulates bone growth, as well as the rheumatoid arthritis drug Methotrexate ("MTX") and Folic Acid.  (*Id*.)

A CT scan dated January 26, 2018, revealed second TMT arthrodesis without osseous fusion and no osseous fusion of the third TMT joint.  (Tr. at 416.)  On March 23, 2018, Dr. DeSilva continued to document left foot pain without improvement on a bone stimulator or Forteo (started October 2017).  (Tr. at 418.)  MTX was also ineffective.  (*Id*.)  Her pain remained consistent at a severity of eight of ten without ability to bear weight, which prevented her from engaging in activities like simple housework.  (*Id*.)  She had also begun to develop hand and elbow pain.  (*Id*.)  Dr. DeSilva cited severe osteoarthritis as the reason for the 2015 surgery, also noting the 2000 car accident.  (*Id*.)  Ingianni's pain was worsened by walking and standing.  (*Id*.)  She utilized a bone stimulator ten hours a night.  (*Id*.)  Dr. Desilva also noted complaint of right MTP joint pain/swelling.  (*Id*.)  On exam, Ingianni used a cane and boot.  (Tr. at 419.)  Dr. DeSilva observed tenderness to the lumbosacral spine and swelling and tenderness to the bilateral first metacarpophalangeal ("MCP") joints of the hands.  (*Id*.)  Dr. DeSilva increased MTX.  (Tr. at 420.)  On October 4, 2018, a CT scan revealed no change, without osseous fusion at the second or third TMT joints.  (Tr. at 422.)

On September 18, 2018, Ingianni returned to Dr. DeSilva, who documented increasing pain in the right first MTP joint and left midfoot.  (Tr. at 425.)  There was no noted improvement with her treatment.  (*Id*.)  Her pain was seven out of ten in severity. (*Id*.)  On exam, Dr. DeSilva observed positive Heberden's and Bouchard's nodes in the hands and carpometacarpal ("CMC") joint arthritis, though tenderness was improved.  (Tr. at 426.)  She further documented tenderness to the left foot and right foot with first MTP joint arthritis.  (*Id*.)

Dr. DeSilva completed a medical source statement dated October 24, 2018.  (Tr. at 424.)

She listed Ingianni's diagnoses as i) midfoot Degenerative Joint Disease, complete nonunion, ii)

hallux rigidus (fused), and iii) post-trauma osteoarthritis of the left foot.  (Tr. at 423.)  Dr.

DeSilva opined that Ingianni was limited to lifting/carrying five pounds occasionally.  (Tr. at

423.)  Dr. DeSilva opined that Ingianni could occasionally lift up to five pounds.  (*Id*.)  She was

able to walk for 10 to 15 minutes without interruption, and could sit for one hour during an eight-

hour workday.  (*Id*.)  She further opined that Plaintiff could never climb, stoop, crouch, kneel, or

crawl, and could occasionally bend or balance.  (Tr. at 424.)  She could frequently reach and

constantly handle but could never push/pull.  (Tr. at 411.)  Ingianni's exposure to heights,

moving machinery, extreme temperatures, and vibration should also be limited.  (Tr. at 424.)  Dr.

DeSilva identified that Ingianni's limitations had been present since October 25, 2015.  (*Id*.)  She

further opined that Ingianni was limited to 10 to 15 minutes of standing/walking and to one hour

of sitting due to swelling of the foot and pain.  (*Id*.)  Dr. DeSilva also stated that Ingianni was

limited to occasional bending and balancing, frequent reaching, and constant handling.  (Tr. at

424.)  Dr. DeSilva noted as well that Ingianni was at risk for further damage with standing,

walking, lifting, bending, or extended sitting.  (*Id*.)

A right foot x-ray dated November 6, 2018 revealed advanced osteoarthritic changes of

the first MTP joint with joint space narrowing and bone spur formation.  (Tr. at 429.)  The bones

were somewhat osteopenic.  (*Id*.)

### III.   Testimonial and Vocational Evidence

Ingianni completed a Function Report dated July 23, 2017.  (Tr. at 222–29.)  She reported

that during the day, she would go to doctors' appointments, rest, speak with her mother, and

watch television.  (Tr. at 222.)  She could not walk for more than 15 minutes at a time before

8

needing to rest for 20 minutes and could not sit for more than 20 minutes at a time.  (Tr. at 223, 227–28.)  She was unable to climb stairs, kneel, or squat.  (Tr. at 227.)  Ingianni used crutches, a cane, and a wheelchair.  (Tr. at 228.)

Ingianni had to sit down both to shower and dress.  (Tr. at 223.)  She was unable to cook due to difficulty standing.  (*Id*.)  Her spouse did all the cooking.  (Tr. at 224.)  Ingianni performed no household chores.  (Tr. at 225.)  She did not drive and was unable to go out alone while wearing her leg brace.  (*Id*.)  She did her shopping online.  (Tr. at 226.)  She watched television and read "every few days."  (*Id*.)  She spoke with her mother and friends three times a week by phone or online.  (*Id*.)  Ingianni said she had difficulties paying attention and remembering things, and was unable to finish what she started.  (Tr. at 228–29.)  She could follow both written and spoken instructions, and had no problems getting along with others.  (Tr. at 229.)

Ingianni also completed a Work History Report.  (Tr. at 214–20.)  She reported that in her past position as a registered nurse during the workday, she walked for five hours, stood for five hours, and sat for eight hours.  (Tr. at 217.)  She also wrote or typed for five hours.  (*Id*.)  She did no lifting.  (*Id*.)  Half of her day was devoted to supervising three other employees; she did not hire or fire employees and was not a lead worker.  (*Id*.)

Application for Benefits

Ingianni applied for Title II disability insurance benefits on May 23, 2017, alleging disability since February 28, 2017, due to injury to both feet, depression, anxiety, high cholesterol, joint disease, and foot pain.  (Tr. at 174–75, 206; *see also* Tr. at 100–01 (showing effective filing date).)  Her application was denied.  (Tr. at 100–10.)

9

Hearing

Ingianni then requested an administrative hearing.  (Tr. at 126–27.)  On November 28, 2018, Ingianni appeared, with counsel, and testified before Administrative Law Judge ("ALJ") Gloria Pellegrino.  (Tr. at 68–99.)  She testified that she last worked in February 2017, and stopped working due to an inability to stand.  (Tr. at 76.)  She injured her foot when she was struck by a car in 2000.  (*Id*.)  After foot surgery in May 2016, she went on "short-term disability" for about four months and returned to work on limited duty.  (Tr. at 77.)  Her foot pain continued and she had another surgery in May 2017 to remove hardware; she then underwent injections to manage pain.  (Tr. at 77–78.)  She had been told an additional surgery was not an option.  (Tr. at 78.)  She wore a walking boot and used a cane.  (Tr. at 79.)

Ingianni testified that she could walk two blocks before needing to rest and could stand for 20 minutes before needing to sit.  (Tr. at 79–80.)  If she sat for more than 30 minutes, her foot would swell and become painful.  (Tr. at 80.)  She would elevate her foot to hip level to relieve the swelling.  (*Id*.)  In a typical day, Ingianni elevated her foot for "about five or six hours."  (*Id*.)  Ingianni also said she was unable to work due to psoriatic arthritis in her right foot and hip pain.  (Tr. at 80–81.)  She did no cooking, cleaning, or laundry.  (Tr. at 81–82.)  She used a seat in the shower.  (Tr. at 83.)  Her pain also caused issues with concentration.  (*Id*.)  Ingianni was not seeing a psychiatrist or psychologist, but her rheumatologist had prescribed Celexa for anxiety.  (*Id*.)

With respect to her previous work as a Director of Clinical Services, Ingianni testified that she performed nursing duties and also managed other nurses.  (Tr. at 86.)

Vocational expert (VE) Stephen Davis appeared and testified.  (Tr. at 85–97; *see* Tr. at 252–54.)  VE Davis identified two nursing positions that Ingianni had previously performed:

registered nurse (Dictionary of Occupational Titles ("DOT") Code No. 079.374-014), classified as medium work, and which Ingianni performed at the medium level, and director of clinical services (DOT Code No. 075.127-014), classified as sedentary work, and which Ingianni performed at the light level. (Tr. at 86–87.)

The ALJ presented the VE with the following hypothetical: an individual with Ingianni's age, education, and work experience, who could perform sedentary work with the following additional limitations: the individual must be able to ambulate away from workstation with a cane; could never push or pull with both legs or operate foot controls; could occasionally climb ramps or stairs; could never climb ladders, ropes, or scaffolds; could never balance; and could not be exposed to hazards such as dangerous moving machinery or unprotected heights. (Tr. at 87–88.) The VE testified that such a person could perform Ingianni's past position of director of clinical services, as the job is commonly performed. (*Id.*) The VE also testified that individuals with Ingianni's work history and specialized knowledge of the medical field frequently opt to transition into three occupations, each classified as sedentary work: utilization coordinator (DOT Code No. 079.262-010), of which there are 34,623 jobs nationally; cardiac monitor technician (DOT Code No. 078.365-010), of which there are 6,368 jobs nationally; and Holter Scanning technician (DOT Code No. 079.264-010), of which there are 4,903 nationally. (Tr. at 90–91.)

The ALJ presented the VE with a second hypothetical, which incorporated all of the limitations of the first hypothetical with the additional limitation of having to elevate one foot frequently throughout the day. (Tr. at 91–92.) The VE testified that such a person could not work in a medical setting in the professions previously identified, as "you've got to be able to move about quickly, rapidly and that elevation of leg is really not a viable option." (Tr. at 91.)

The VE confirmed that even sedentary jobs that can be performed while seated would be hampered by the foot elevation requirement.  (Tr. at 92.)

The ALJ presented the VE with a third hypothetical, incorporating all of the limitations of the first hypothetical with the additional limitation of requiring a sit/stand option allowing for a change of position from one to two minutes every hour.  (*Id*.)  The VE testified that this additional limitation would not be an impediment in any of the roles mentioned in the first hypothetical.  (*Id*.)  The VE further testified that employer tolerance for time off task, for jobs in a medical setting, is "no more than 2%" given that "lives are in your hands" in those jobs, and employers would tolerate fifteen days off of work in a year.  (Tr. at 92–93.)

The ALJ's Decision

The ALJ evaluated Ingianni's claim de novo and, on January 3, 2019, issued a decision finding Ingianni not disabled.  (Tr. at 10–19.)  At step one of the sequential analysis, the ALJ found Ingianni had not engaged in substantial gainful activity since February 28, 2017, her alleged onset date.  (Tr. at 12.)  At step two, the ALJ determined that Ingianni's left ankle fracture-status post-surgery, non-complete union; osteoarthritis of the left foot; and degenerative joint disease were severe impairments.  (Tr. at 12–14.)  The ALJ determined that Ingianni's high cholesterol, depression, and anxiety did "not cause more than minimal limitation" and so were non-severe.  (Tr. at 12–13.)  At step three, the ALJ found that Ingianni's impairments, either singly or in combination, did not meet or medically equal the criteria of a listed impairment.  (Tr. at 14–15.)  Specifically, the ALJ found that Ingianni's impairments did not meet the enumerated requirements of Listing 1.02, major dysfunction of a joint, or of Listing 1.06, fracture of the femur, tibia, pelvis, or one or more of the tarsal bones.  (Tr. at 14.)

At step four, the ALJ assessed Ingianni's symptoms and determined her residual function capacity ("RFC"), or what she could do despite the limitations caused by her impairments.  (Tr. at 15–17.)  The ALJ found that Ingianni had the RFC to perform sedentary work, with the following additional limitations: Ingianni must be able to ambulate away from workstation with a cane; she could never push or pull with both legs or operate foot controls or pedals; Ingianni could occasionally climb ramps or stairs; she could never climb ladders, ropes, or scaffolds; she could never balance; she could not be exposed to hazards such as dangerous moving machinery or unprotected heights; and she had to be afforded a sit-stand option allowing a change of position briefly for one to two minutes every hour without leaving the workstation.  (*Id*.)  The ALJ found the RFC opinion of Dr. Sheskier "somewhat persuasive" but found that "there is no back impairment to support the restrictions related to stooping, crouching, kneeling or crawling." (Tr. at 17.)  Additionally, the ALJ stated that the record demonstrated that Ingianni had "full range of motion in her ankles, full muscle strength in her lower extremity, and [had] been walking around during the hearing…." (*Id*.)  The ALJ also found the opinion of Dr. Teli "somewhat persuasive" but found the restriction on bending to be inconsistent with the record. (*Id*.)  Finally, the ALJ found that Dr. DeSilva's RFC opinion was "somewhat persuasive" but, like Dr. Sheskier's opinion, found that the restrictions on stooping, crouching, kneeling, or crawling were not supported by the record as there was no back impairment.  (*Id*.)  As with Dr. Sheskier's opinion, the ALJ departed from Dr. DeSilva's opinion because Ingianni had full range of motion in her ankles, full muscle strength in her lower extremity, and had been "walking around" during the hearing.  (*Id*.)

Also at step four, the ALJ determined, based on the VE's testimony, that Ingianni was able to perform her past relevant work as a Director at a Nursing Service, as well as other roles

13

existing in the national economy such as Utilization Review Coordinator, Cardiac Monitor

Technician, and Holter Scanning Technician.  (Tr. at 18–19.)  The ALJ thus determined that

Ingianni was not disabled under the Act.  (Tr. at 19.)

On March 22, 2019, the Appeals Council denied Ingianni's request for review and the

ALJ's decision became the Commissioner's final decision.  (Tr. at 1–3.)

### IV.     The Instant Action

On May 21, 2019, Ingianni commenced this action, seeking reversal of the decision of

the Commissioner of Social Security pursuant to Section 205(g) of the Social Security Act, as

amended, 42 U.S.C. § 405(g), 1383(c)(3).  Ingianni and the Commissioner now cross-move for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

In Ingianni's Memorandum of Law, she argues that the ALJ failed to appropriately weigh

the opinion evidence, resulting in an RFC determination that was not supported by substantial

evidence.  (Pl.'s Mem. (Doc. No. 18) at 9–12.)  Specifically, Ingianni objects to the ALJ giving

substantial weight to Dr. Teli, Dr. Sheskier, and Dr. DeSilva, thereby failing to give increased

weight to the treating sources or providing sufficient explanation for how she weighed the

evidence.  (*Id.* at 11.)  Further, Ingianni argues that the sit-stand option included in the ALJ's

RFC assessment is not supported by the record and that the ALJ failed to properly weigh

Ingianni's subjective complaints of limitation and pain.  (*Id.* at 13–17.)  Finally, Ingianni argues

that the ALJ failed to properly consider whether Ingianni's condition was medically equivalent

to Listing 1.06.  (*Id.* at 17–20.)

The Commissioner controverts these arguments in his Memorandum of Law in Support

of Defendant's Cross-Motion for Judgment on the Pleadings, arguing that Ingianni has cited the

wrong standard to support her assertion that the ALJ's decision was not supported by substantial

evidence, and that the ALJ properly weighed the opinion evidence under the appropriate standard as enumerated in 20 C.F.R. § 404.1520c.  (Def.'s Opp. (Doc. No. 20) at 20–24.)  Further, the Commissioner argues that substantial evidence supports the ALJ's RFC determination and that the ALJ appropriately considered Ingianni's subjective complaints.  (*Id*. at 25–26.)  Finally, the Commissioner argues that the evidence in the record does not support a finding that Ingianni's condition was equivalent to Listing 1.06.  (*Id*. at 18–19.)

## STANDARD OF REVIEW

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. § 1383(c)(3).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera*

*v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies only to the Commissioner's factual determinations.  Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration.  *Zabala v. Astr*ue, 595 F.3d 402, 409 (2d Cir. 2010).

Eligibility for SSI

In order to be eligible for SSI, an individual must be blind, aged or disabled and fall within certain income and resource limits.  *See* 42 U.S.C. §§ 1381, 1382(a).  An adult individual is "considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 1382c(a)(3)(A).  The physical or mental impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .  42 U.S.C. §§ 1382c(a)(3)(B).  The term, "work which exists in the national economy," is defined to mean

"work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step framework set forth in 20 C.F.R. § 416.920(a)(4). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). Nonetheless, "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Id.* (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)).

## DISCUSSION

At step three of the required five-step analysis, the Commissioner must consider the objective medical evidence to determine if the impairment or combination of impairments meets, or is medically equivalent to, the criteria of an impairment listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P ("Appendix 1"). 20 C.F.R. § 404.1520(d).

Medical equivalence can be established in three ways. First, the claimant may meet her burden of showing medical equivalence if she has "an impairment that is described in [A]ppendix 1, but [does] not exhibit one or more of the findings specified in the particular listing, or," the claimant "exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing," and there are "other findings related to [the] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 404.1526(b)(1). Second, medical equivalence may be established if the claimant has an "impairment(s) that is not described in [A]ppendix 1, [but] findings related to [the]

17

impairment(s) are at least of equal medical significance to those of a listed impairment." 20

C.F.R. § 404.1526(b)(2).  Third, a claimant may show medical equivalence if she has "a

combination of impairments, no one of which meets a listing, [but] the findings related to [the]

impairments are at least of equal medical significance to those of a listed impairment." 20

C.F.R. § 404.1526(b)(3).

In determining medical equivalence at step three, the Commissioner must consider all

relevant evidence in the case record, as well as "the opinion given by one or more medical or

psychological consultants designated by the Commissioner." 20 C.F.R. §404.1526(c); *see also*

SSR 86-8, 1986 SSR LEXIS 15, at *9–10 ("Any decision as to whether an individual's

impairment or impairments are medically the equivalent of a listed impairment must be based on

medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic

techniques, including consideration of a medical judgment about medical equivalence furnished

by one or more physicians….").  Failure to solicit and consider medical evidence for a medical

equivalency determination is error. *Marcano v. Berryhill*, No. 17-CV-4442 (KMK) (PED), 2018

WL 5619749, at *12 (S.D.N.Y. July 13, 2018).

Here, the ALJ determined at step three that Ingianni's impairments, either separately or in

combination, did not meet the enumerated requirements of Listing 1.06.  (Tr. at 14–15.)  Listing

1.06 requires the following:

> Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones with: A)
> solid union not evident on appropriate medically acceptable imaging and not
> clinically solid, and B) inability to ambulate effectively, as defined in 1.00B2b,
> and return to effective ambulation did not occur or is not expected to occur within
> 12 months of onset.

20 C.F.R. Part 404, Subpart P, Appendix 1, §1.06.  Under § 1.00B2b, an

> Inability to ambulate effectively means an extreme limitation of the ability to
> walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's

18

> ability to independently initiate, sustain, or complete activities. Ineffective
> ambulation is defined generally as having insufficient lower extremity functioning
> . . . to permit independent ambulation without the use of a hand-held assistive
> device(s) that limits the functioning of both upper extremities.

20 C.F.R. Part 404 Subpart P, Appendix 1, § 1.00B2b(1).  To further illuminate this definition, §

1.00B2b(2) states,

> To ambulate effectively, individuals must be capable of sustaining a reasonable
> walking pace over a sufficient distance to be able to carry out activities of daily
> living. They must have the ability to travel without companion assistance to and
> from a place of employment or school. Therefore, examples of ineffective
> ambulation include, but are not limited to, the inability to walk without the use of
> a walker, two crutches or two canes, the inability to walk a block at a reasonable
> pace on rough or uneven surfaces, the inability to use standard public
> transportation, the inability to carry out routine ambulatory activities, such as
> shopping and banking, and the inability to climb a few steps at a reasonable pace
> with the use of a single hand rail. The ability to walk independently about one's
> home without the use of assistive devices does not, in and of itself, constitute
> effective ambulation.

20 C.F.R. Part 404 Subpart P, Appendix 1, § 1.00B2b(2).

The ALJ "specifically considered" Listing 1.06 but determined that "the claimant does

not meet the enumerated requirements."  (Tr. at 14.)  However, the ALJ's decision is devoid of

discussion as to whether Ingianni's impairments were medically equivalent to that listing.  The

ALJ does not cite to medical opinion evidence to determine whether her degenerative joint

disease with complete nonunion and fused TMT joints were medically equivalent to having a

fracture of one or more of the tarsal bones with solid union not evident.  The ALJ finds only that

there is no fracture visible on "appropriate medically acceptable imaging."  (Tr. at 15.)

Moreover, though Ingianni's mobility limitations do not equal the definition of inability to

ambulate effectively because Ingianni reported she uses a cane to walk, which is not a "hand-

held assistive device[] that limits the functioning of both upper extremities" as defined in §

1.00B2b(1), both Dr. DeSilva and Dr. Sheskier opined that Ingianni was severely limited in her

19

ability to walk during a workday and Ingianni submitted evidence that she cannot leave the house alone while wearing her foot brace and she does not engage in routine activities such as shopping or laundry.  The ALJ's decision makes no mention of these ambulatory restrictions and does not address whether they are sufficient to constitute an inability to ambulate effectively as set forth in § 1.00B2b.  The ALJ must provide a basis for determining that Ingianni's impairments were not medically equivalent to Listing 1.06 and consider medical opinion evidence in making that determination.

## CONCLUSION

Federal regulations explicitly authorize a court reviewing decisions of the SSA to order further proceedings when appropriate.  42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").  Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard."  *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)) (internal quotation marks omitted).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  *Pratts*, 94 F.3d at 39.  However, if the record before the Court provides "persuasive proof of disability … a remand for further evidentiary proceedings would serve no purpose," and the Court may reverse and remand solely for the calculation and payment of benefits.  *See, e.g.*, *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013).

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied, and Ingianni's motion for judgment on the pleadings is granted to the extent

it seeks remand.  This matter is remanded to the Commissioner of Social Security for further

proceedings consistent with this Memorandum and Order.  The Clerk of Court is respectfully

directed to enter judgment in accordance with this Memorandum and Order and to close this

case.

SO ORDERED.

Dated: Brooklyn, New York
      January 11, 2021

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge